F. Arthur Osterman v. Commissioner.
Osterman v. Commissioner
Docket No. 106704.
United States Tax Court
1942 Tax Ct. Memo LEXIS 36; 1 T.C.M. (CCH) 243; T.C.M. (RIA) 42659; December 16, 1942
*36 Held, petitioner is not entitled to deduct a loss by reason of a $10,000 payment in 1937 on certain notes held by a bank, there being no evidence to indicate that the notes did not represent obligations which were legally binding on petitioner. Thomas M. A. Higgins, Esq., 420 Fairburn Bldg., Lowell, Mass., for the petitioner. Melvin R. Sears, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined a deficiency against petitioner in income tax for the calendar year 1937 in the sum of $630.61. The sole issue is whether a payment of $10,000 on notes held by the Union National Bank of Lowell, Massachusetts, during 1937 constituted a deductible loss. Findings of Fact We adopt as a part of our findings of fact the stipulation of the parties, which is substantially as follows: Petitioner, a resident of Tewksbury, Massachusetts, filed his income tax return for the calendar year 1937 with the Collector of Internal Revenue in Lowell, Massachusetts. Petitioner owned and operated a fuel business in Lowell and Wilmington, Massachusetts, for several years until about March 1929, when he became manager of Daniel Gage, Inc., a corporation organized *37 under the laws of Massachusetts and located in Lowell. The business of the corporation was the harvesting, manufacturing, and selling of ice at wholesale and retail. On or about May 1, 1929, petitioner sold his Lowell fuel business for $50,000 and on or about July 1, 1929, he sold his Wilmington fuel business for $22,000. The proceeds of these transactions he deposited in the Union Old Lowell National Bank, a banking corporation located in Lowell, (also known as the Union National Bank and the Union National Bank of Lowell. Hereinafter it will be referred to as the "Bank".) Petitioner sought the advice of the president of the bank as to how this sum should be invested. The president referred him to the vice-president of the bank who, acting for the bank, invested the funds in securities. The securities so purchased for the petitioner were kept by the bank in safekeeping for petitioner. Petitioner became financially interested in and treasurer of, Daniel Gage, Inc. This corporation had occasion to borrow money from the bank on its corporate notes, endorsed by petitioner individually. Petitioner, as an officer of Daniel Gage, Inc., from time to time left with the vice-president *38 of the bank promissory notes signed in blank by petitioner. These promissory notes were to be used by the vice-president for renewal of the indebtedness of Daniel Gage, Inc., to the bank. Petitioner individually was also an endorser of the notes of Daniel Gage, Inc. The vice-president of the bank on various dates filled in without authority from petitioner three of the promissory notes executed in blank by petitioner, for the principal sum of about $40,000. The vice-president put these promissory notes through the records of the bank. The third note in the amount of $10,000 was dated June 21, 1931. This note has been lost. Renewals of the notes were handled in a similar fashion. It is not known whether the proceeds of these notes were at any time credited to petitioner's account on the books of the bank. The acts of the vice-president of the bank in connection with the promissory notes were discovered in 1934 after his death by suicide to avoid arrest. Securities belonging to petitioner, including those set forth as collateral on the notes, were also taken from safekeeping by the bank official prior to 1934 and used for his own purposes. They were not turned over to petitioner or *39 to anyone on his behalf. This officer also embezzled securities belonging to other customers of the bank. The other customers of the bank whose securities were embezzled by the vice-president were reimbursed by the bank or its surety. The amount of the bank's surety company bond covering the vice-president was sufficient to meet all liabilities brought about by his conduct, including the bank's obligation to petitioner. The bank acknowledged its responsibility for the acts of its vice-president above enumerated, and in 1934 acknowledged its obligation to petitioner for his securities. On May 27, 1935, petitioner gave the bank a release of all demands, including its liability to him for the acts of its vice-president. At the time petitioner gave the release to the bank, Daniel Gage, Inc., owed the bank a substantial sum of money, evidenced by its corporate promissory notes, all of which petitioner had endorsed individually. Petitioner did not expect the bank to call for payment of the $40,000 promissory notes. The bank did call for payment of $10,000 on account of the $40,000 in 1937, which petitioner paid. The deficiency asserted arises out of the disallowance of this payment *40 as a deduction. In addition to the stipulated facts, we find the following additional facts: Petitioner's income tax return for the taxable year was filed on a cash basis. A bank examiner requested the bank to obtain a release from petitioner of his claim against the bank for speculations by the bank's vice-president. Petitioner gave such a release to the bank because he felt that otherwise the bank might demand immediate payment of the promissory notes due from Daniel Gage, Inc., and endorsed by petitioner individually. At that time neither Daniel Gage, Inc. nor petitioner was in a position to pay these notes. There was no consideration for the release. Opinion VAN FOSSAN, Judge: The sole issue is whether the $10,000 payment by petitioner on promissory notes held by the Bank constituted a deductible loss. No evidence has been presented by petitioner to show whether he was legally bound to pay the notes in question. In fact, the parties have stipulated, and petitioner himself testified at the hearing, that it is not known whether or not the amount obtained from these notes was credited to petitioner's account at the Bank. While a vice-president of the Bank filled in the notes *41 without authority from petitioner, it is possible that the funds from the notes may have been credited to petitioner's account. Under such a circumstance, of course, the notes would have represented valid claims against petitioner. Assuming, as we properly may, that petitioner's account was credited with the proceeds of the notes, petitioner's payment of $10,000 in satisfaction of a legal obligation did not constitute a deductible loss. As the Board of Tax Appeals stated in , "Deductions are not permitted on account of the repayment of loans." Petitioner has failed to sustain his burden of proving that the notes on which the $10,000 payment was made did not represent binding legal obligations. For tax purposes, we can see no relationship between the claim which petitioner had against the Bank for losses resulting from embezzlement of petitioner's securities by the Bank's vice-president and the $10,000 payment on the notes. Apparently, petitioner takes the position that because of the claim which he had against the bank as a result of such embezzlement, he was not legally bound to make the $10,000 payment. If petitioner *42 was not legally bound to the bank on the notes, then the $10,000 payment was voluntary. Voluntary payments do not result in deductible losses. ; . However, there are indications that petitioner did recognize the validity of the notes as he gave the bank a release from any claim which he had for losses resulting from embezzlement by the vice-president, without requiring a surrender of the notes. Furthermore, the $10,000 payment itself is prima facie an indication that petitioner recognized the validity of the notes. We hold that petitioner is not entitled to a loss on the $10,000 payment to the bank in 1937. Decision will be entered for the respondent.